[29 NYS3d 253]

BMW GROUP LLC et al., Appellants, v CASTLE OIL CORPORA-
TION, Respondent.

MID ISLAND L.P., Doing Business as MADISON MANAGEMENT OF
QUEENS, et al., Appellants, v HESS CORPORATION, Respon-
dent.

First Department, March 15, 2016

### APPEARANCES OF COUNSEL

*Wachtel Missry LLP*, New York City (*Julian D. Schreibman, William B. Wachtel* and *Stella Lee* of counsel), and *Grossman LLP*, New York City (*Stanley M. Grossman* and *Judd B. Grossman* of counsel), for appellants.

*Holland & Knight LLP*, New York City (*Michael D. Hess, Robert J. Burns, Benjamin R. Wilson* and *Stosh M. Silivos* of counsel), for Castle Oil Corporation, respondent.

*White & Case LLP*, New York City (*David G. Hille, Heather K. McDevitt* and *Kim Haviv* of counsel), for Hess Corporation, respondent.

### OPINION OF THE COURT

SAXE, J.

In these two appeals, we reinstate the complaints, holding that when the proper standard of review for a CPLR 3211 (a) (7) motion is applied, and the complaints' factual assertions, along with any inferences that can be drawn from them, are accepted as true, the complaints' allegations are sufficient to state a cause of action. Essentially, plaintiffs allege that the respective defendants provided their customers (plaintiffs) with inferior, adulterated heating oil, i.e. that the fuel oil that was delivered to them contained oils of lesser value mixed into the ordered grade of fuel oil, so that the delivered product did not meet the standards of the parties' contracts. These assertions suffice to allege breaches of contract and of UCC warranties.

The Two Actions

The impetus for these putative class actions was an investigation initiated by the law firm of Wachtel Masyr & Missry in 2011, before it contacted or was retained by plaintiffs in these cases. The firm undertook an independent investigation when it learned about a criminal investigation being conducted by the New York County District Attorney's office regarding claimed misconduct in the fuel oil industry in New York.[1]

As detailed in an affidavit by private investigator Anthony Valenti that was provided to Supreme Court in the context of

---

**1.** State and federal authorities were also involved in investigation of the heating oil industry.

an earlier injunction motion, in October 2011, the law firm hired the investigation firm of Stroz Friedberg, LLC, "in connection with an ongoing investigation into fraud and misconduct in the retail heating oil business in the New York metropolitan area." In regard to the claim against defendant Hess, Valenti stated that beginning in December 2011 and continuing intermittently for a period of months, he supervised surveillance of an oil facility in Astoria, during which members of his surveillance team observed and recorded the loading of what plaintiffs term "waste oil"[2] onto trucks that were then loaded with No. 4 and No. 6 fuel oil at a Hess terminal, resulting in the delivery of a blended oil product to customers. As to the claims against defendant Castle Oil, Valenti stated that in November 2012, he arranged for a sample of No. 4 fuel oil delivered by Castle to a Manhattan building owned by plaintiff BMW Group LLC to be tested by a laboratory, and the test demonstrated that the oil did not conform to the specifications for No. 4 fuel oil.

Both actions were commenced on March 13, 2013, immediately after governmental investigations culminated in a raid of five businesses, not involving defendants here. In the action brought against Castle Oil (appeal 16138), the five named plaintiffs are New York limited liability companies, each of which owns and operates a residential apartment building or a commercial building in New York. Suing on their own behalf and on behalf of a class of Castle Oil customers, they allege that during the four previous years they ordered from defendant Castle either No. 4 fuel oil or No. 6 fuel oil, and paid the retail price for that oil, but that the product Castle delivered was a mixture of those grades of fuel oil and waste oil or other types of inferior oil.

In the action against Hess (appeal 16139), plaintiffs Mid Island L.P. and Carnegie Park Associates, L.P. own and manage residential and commercial buildings in the New York metropolitan area whose heating systems are designed to burn either No. 4 or No. 6 fuel oil. Suing on their own behalf and on behalf of a class of Hess fuel oil customers, they allege that

---

**2.** The Hess complaint supplies the definition of "waste oil" found in Rules of the New York State Department of Environmental Conservation (6 NYCRR) § 225-2.2 (b) (11): "Used and/or reprocessed engine lubricating oil and/or any other used oil, including but not limited to, fuel oil, engine oil, gear oil, cutting oil, transmission fluid, hydraulic fluid, dielectric fluid, oil storage tank residue, animal oil and vegetable oil, which has not subsequently been re-refined."

they contracted with Hess for the purchase of No. 4 and No. 6 fuel oil at various times between 2009 and 2013, but received a blend containing waste oil. Plaintiffs state that they were the victims of a scheme perpetrated by Hess's independent transportation companies, which skimmed a percentage of the pure No. 4 and No. 6 fuel oil that they picked up from Hess, and replaced it with waste oil, which they then delivered to customers.

The Underlying Dismissal Motions

Following earlier motions and re-pleaded complaints, Hess and Castle each moved to dismiss the complaint against it, pursuant to CPLR 3211 (a) (7). The motion court granted those motions; in both cases, while it declined to dismiss based on grounds of untimely notice pursuant to UCC 2-607 (3) (a), it agreed with defendants that the complaints, while alleging that a blended fuel oil was delivered to plaintiffs, did not allege that any injury was caused to them by the use or the burning of this blended oil. The court reasoned that the claim that the delivered oil was less valuable than the product plaintiffs paid for was not sufficient to state a cause of action, relying on the proposition that a claim of economic damages based on nonconforming goods is insufficient in the absence of any demonstrable ill effect or negative impact on the product's performance or utility.

Discussion

The issue is whether, as the motion court concluded, plaintiffs' claims amount to merely "theoretical defects" that do not justify a claim for breach of warranty or breach of contract because they did not cause economic loss (2014 NY Slip Op 33708[U], *12 [2014]).

The so-called "tendency to fail" or "no injury" latent defect cases on which the motion court relied are inapposite. Actions alleging latent design defects where no accident had been caused by the alleged defect, and no property damage or personal injury occurred, are in essence products liability cases (*see e.g. Frank v DaimlerChrysler Corp.*, 292 AD2d 118 [1st Dept 2002], *lv denied* 99 NY2d 502 [2002]; *Feinstein v Firestone Tire & Rubber Co.*, 535 F Supp 595 [SD NY 1982]). Their core allegation is essentially that the defendant produced or sold a defective product and/or failed to warn of the product's dangers. Here, however, the claim is "rooted in basic contract law" (*see Coghlan v Wellcraft Mar. Corp.*, 240 F3d 449, 455 n 4 [5th Cir 2001]). In *Coghlan*, the plaintiffs purchased a

recreational fishing boat that they were told was all-fiberglass construction, which was superior to their wood-fiberglass hybrid counterparts. The Court explained: "The wrongful act in a no-injury products suit is . . . the placing of a dangerous/ defective product in the stream of commerce," whereas "the wrongful act alleged by the Coghlans is [the defendant's] failure to uphold its end of their bargain and to deliver what was promised" (id.).

We perceive no valid basis for the distinction drawn by the motion court, between the sale of fishing boats or olive oil and the sale of heating oil. Even if the purchaser does not qualify as a "consumer" for purposes of consumer protection laws, if the goods that are delivered do not conform to the goods contemplated by the sale contract, the purchaser has a cause of action under the Uniform Commercial Code.

An issue is raised as to whether plaintiffs successfully alleged that the delivered goods were nonconforming.

Both sides cite and discuss regulatory standards concerning heating oil, beginning with the Administrative Code of the City of New York, which defines "heating oil" as "oil refined for the purpose of use as fuel for combustion in a heating system and that meets the specifications of the American Society of Testing and Materials designation D 396-09a or other specifications as determined by the commissioner" (id. § 24-168.1 [a] [6]). The applicable American Society of Testing and Materials (ASTM) specifications for fuel oil, contained in the record, establish detailed requirements for the different grades of oil, using such categories as minimum flash point temperature, viscosity, density, and maximum percentages of ash and sulfur.

Plaintiffs essentially allege that, consistent with the ASTM specifications, as well as common commercial usage, and pursuant to the UCC, customers purchasing goods described as No. 4 and No. 6 fuel oil are entitled to presume that they are receiving 100% fuel oil of the specified grade, and not a product consisting of a blend of No. 4 or No. 6 fuel oil with some other types of oil that do not meet the criteria of those ASTM specifications.

More specifically, plaintiffs in the Castle Oil matter allege that "Castle intentionally adulterates its fuel oil products by using other, cheaper oils (primarily used motor and lubricating oil) as filler, resulting in an inferior blended petroleum product." They explain that lubricating oil and fuel oil are different chemical substances, and that lubricating oils are

designed with a higher boiling point than fuel oil and do not burn efficiently at temperatures typical in nonindustrial heating systems. Additionally, because lubricating oils contain chemical additives not found in fuel oil, burning them in heating systems such as those in plaintiffs' buildings will tend to produce more soot and particulate matter pollution, reducing the efficiency of the heating system and creating an increased risk of fire. They also assert that while regulations permit used lubricating oil to be re-refined and used as fuel in high-temperature industrial settings, the used lubricating oil purchased by Castle to blend with its fuel oil was never refined for use as fuel.

Plaintiffs in the Hess matter assert that Hess's transportation companies mixed the Hess fuel oil with 15-25% "waste oil" as that term is defined in the Rules of the New York State Department of Environmental Conservation (6 NYCRR) § 225-2.2 (b) (11): "Used and/or reprocessed engine lubricating oil and/or any other used oil, including but not limited to, fuel oil, engine oil, gear oil, cutting oil, transmission fluid, hydraulic fluid, dielectric fluid, oil storage tank residue, animal oil and vegetable oil, which has not subsequently been re-refined." They also assert that the waste oil contaminants impair the performance of the heating systems into which they are introduced, and that fuel oil adulterated with waste oil has a lower heat content than No. 4 and No. 6 fuel oil, so that they (the customers) needed to purchase more oil than they would have if they had received 100% fuel oil.

In support of its position, Castle explains that it blends its fuel using petroleum products called "cutter stock," which its suppliers warrant meets the requirements of applicable federal rules. It protests that it made no express warranty that its No. 4 or No. 6 fuel oil would contain only pure fuel oil, and that the governing regulatory regime expressly authorizes the use of "on-specification used oil"[3] as heating fuel. It concludes that in view of this authorization, plaintiffs cannot bring a cognizable claim that Castle failed to deliver No. 4 and No. 6 fuel oil as those products are defined in the applicable ASTM standards.

■ Initially, any policy of the state or federal government allowing or encouraging the use of certain forms of used oil for

---

**3.** The term "on-specification" is not used in the complaint, or in any evidentiary materials submitted by Castle; Castle seems to employ the term to support its position that blended oil is permitted, as long as the added oil is "on-specification."

fuel (*see e.g.* 42 USC §§ 6901, 6935 [a]; 6903 [37]; 40 CFR 279.1 *et seq.*; ECL 23-2301, 23-2303) does not necessarily or automatically justify its use for purposes of the parties' contracts, and does not provide a basis for dismissal of these complaints. Of course, at this pleading stage we cannot and need not determine the chemical composition of what Castle delivered to fulfill orders for No. 4 and No. 6 fuel oil, or whether the products plaintiffs received conformed to the specifications for those grades of fuel oil. Moreover, the absence in the amended complaint in the Hess action of a specific allegation regarding the exact nature and characteristics of the "waste oil" allegedly mixed with Hess's pure No. 4 and No. 6 fuel oil is not fatal at this juncture; it is a fair inference that the substitution of less valuable filler for 15-25% of the pure oil would reduce the quality, and the value, of the delivered oil.

■ Under UCC 2-714 (2), the measure of damages for breach of warranty is the difference between the value of the goods delivered and the value of the goods as warranted (*Belfont Sales Corp. v Gruen Indus.*, 112 AD2d 96 [1st Dept 1985]; *B. Milligan Contr. v Mancini Assoc.*, 174 AD2d 136, 139 [3d Dept 1992]; *City of New York v Pullman Inc.*, 662 F2d 910, 916 [2d Cir 1981], *cert denied* 454 US 1164 [1982]). Since we must infer from the complaint that plaintiffs received nonconforming oil deliveries of lesser value than those they contracted and paid for, causes of action for breach of contract and breach of warranty—including plaintiffs' damages—are stated in each action.

Defendants' alternative arguments for dismissal are similarly meritless. In particular, the question of whether plaintiffs gave timely notice of the alleged nonconformity presents a question of fact (*see New York City Off-Track Betting Corp. v Safe Factory Outlet, Inc.*, 28 AD3d 175, 178 [1st Dept 2006]).

Accordingly, the orders of the Supreme Court, New York County (Shirley Werner Kornreich, J.), entered September 11, 2014, which granted defendant Hess Corporation's motion in appeal 16139 and defendant Castle Oil Corporation's motion in appeal 16138 to dismiss the complaint, should be reversed, on the law, with costs, and the motions denied.

TOM, J.P., RICHTER and GISCHE, JJ., concur.

Orders, Supreme Court, New York County, entered September 11, 2014, reversed, on the law, with costs, and defendants' motions to dismiss the complaint denied.